IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICKOLE NESBY,                          )
                                        )
                                        )     2:18-CV-01655-CCW
        Plaintiff,                      )
                                        )
    v.                                  )
                                        )
JANET YELLEN,                           )
                                        )
        Defendant.                      )
                                        )
                                        )

**OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Before the Court are Plaintiff Nickole Nesby's ("Plaintiff") Motion for Partial Summary
Judgment, ECF No. 48, and Defendant Janet Yellen's ("Defendant") Motion for Summary
Judgment.  ECF No. 44

In her Complaint, Plaintiff, a former employee of the Internal Revenue Service, alleges that
the Defendant discriminated her on the basis of her disability, in violation of the Rehabilitation
Act, 29 U.S.C. § 701 *et seq.*, and retaliated against her for engaging in protected activity, in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  ECF No. 1 at
¶¶ 58 and 59.  Plaintiff asserts that beginning in July 2014, when she was hospitalized to treat her
major depressive disorder, the IRS began discriminating against her on the basis of her disability
by delaying and refusing to process or approve her hardship relocation requests to transfer to an
IRS location closer to certain members of her family.  Plaintiff also claims that the IRS was
motivated by retaliatory animus against her when it delayed and refused to process her hardship
relocation requests.

The parties filed cross-motions for summary judgment.  *See* ECF Nos. 44 and 48.  Plaintiff
seeks partial summary judgment, with respect to her Rehabilitation Act claim.  ECF No. 48.

Defendant seeks summary judgment with respect to both Plaintiff's Rehabilitation Act claim and her Title VII retaliation claim. ECF No. 44. For the following reasons, Defendant's Motion will be granted with respect to Plaintiff's Rehabilitation Act claim, and denied with respect to Plaintiff's Title VII retaliation claim. Plaintiff's Partial Motion will be denied.

## I. Undisputed Factual Background

Plaintiff began working for the Internal Revenue Service in October 2007 and spent most of the next six-plus years as a Contact Service Representative ("CSR") at the IRS's Pittsburgh call center. ECF No. 58, at ¶ 2; ECF No. 53, at ¶ 1. As a CSR, Plaintiff fielded phone calls and correspondence from taxpayers, reviewed the taxpayers' accounts in the IRS's computer database, and then attempted to answer the taxpayers' questions regarding balance due issues, math error adjustments, and their small businesses. ECF No. 58, at ¶ 3. From January 2014 through early July 2014, Plaintiff participated in a temporary, Frontline Management Trainee ("FMT") program in the Pittsburgh office. *Id.* at ¶ 6. Plaintiff claimed that, during her time as an FMT, her temporary immediate supervisor, Robert Fedor, discriminated and harassed her on the basis of race. *Id.* at ¶ 7; *see also*, ECF No. 47-8. She claimed that, as a result of the racial discrimination and harassment she suffered, she reached out to a union steward before filing her charge of discrimination. ECF No. 47-8, at 3.

On or around July 14, 2014, at approximately the same time her position as an FMT came to an end, Plaintiff had a mental breakdown and was admitted to Western Psychiatric Institute and Clinic ("WPIC") where she was hospitalized for several days and diagnosed with major depressive disorder. ECF No. 58, at ¶¶ 8–9; ECF No. 50, at ¶ 4; ECF No. 53, at ¶ 4. The same day Plaintiff was admitted to WPIC in July 2014, Plaintiff emailed her direct supervisor, Twanna Garrison, that she had been "admitted to the hospital" and intended to "invoke [her] FMLA" immediately. ECF

No. 58, at ¶ 10.  On July 17, 2017, Plaintiff faxed an Application for Leave under the Family and Medical Leave Act and a Certification of Health Care Provider for Employee's Serious Health Condition to Ms. Garrison.  ECF No. 58, at ¶ 11;  ECF No. 53, at ¶ 5.  Her FMLA Application stated that "[d]ue to the continuous hostile work environment and discriminatory practices at the Pittsburgh call site, I have been admitted to Western Psychiatric Institute & Clinic.  I have been receiving treatment for these issues since 2012."  ECF No. 58, at ¶ 12.  In the accompanying FMLA Certification, Plaintiff's treating psychiatrist checked "yes" that Plaintiff was "unable to perform any of [her] job functions due to [her] condition," and that Plaintiff would be "incapacitated for a single continuous period of time due to her medical condition."  *Id.*;  ECF No. 47-11, at 4.  In her FMLA Application, Plaintiff checked the box that she has "[a] personal serious health condition which prohibits [her] from performing the essential functions of [her] position" and indicated that the anticipated starting date of the requested FMLA leave was July 14, 2014 and the anticipated ending date of the requested FMLA leave was July 14, 2015.  ECF No. 47-11, at 10.

The FMLA application materials contained an "Authorization for Disclosure of Information," which is a form used by Federal Occupational Health Services to obtain medical information for employees who request FMLA leave or reasonable accommodations under the Rehabilitation Act.  *See* ECF No. 47-11, at 7.  Section 2 of the Authorization for Disclosure of Information asks the applicant to "[i]dentify the [p]urpose or [n]eed for the [d]isclosure" and Plaintiff chose FMLA, not reasonable accommodation.  *Id*.  The form indicates that applicants should only check one box and that based on the reason for the disclosure, the form application would be handled by different people.  *Id*.  The FMLA Certification also contained a "Federal Occupational Health Case Transmittal" that asks the applicant to identify the forms he or she will

be including with the medical request and to identify the type of service that he or she is requesting. *Id*. at 8.

Following her July 2014 hospitalization, Plaintiff applied for government-based disability benefits claiming that she was unable to work because of her depression. ECF No. 58, at ¶ 80. In connection with Plaintiff's application for disability benefits, Dr. Veronica Pratt, M.D. completed Section II of the Employability Assessment Form, a form that is used by the Pennsylvania Department of Public Welfare to make an assessment of a patient's qualification for General Assistance benefits based on her ability to work. *Id.*; ECF No. 47-46. Dr. Pratt's assessment of Plaintiff, dated August 11, 2014, resulted in a primary diagnosis of major depressive disorder based on a physical examination and review of Plaintiff's medical records and clinical history. ECF No. 47-46. As to Plaintiff's employability at that time, Dr. Pratt checked:

> **TEMPORARILY DISABLED – LESS THAN 12 MONTHS –** Is currently disabled due to a temporary condition as a result of an injury or an acute condition and the disability **temporarily** precludes any gainful employment. The temporary disability began _____ and is expected to last until _____.

*Id.* (emphasis in original). In the blanks for the beginning and end of the temporary disability, Dr. Pratt penned in 7/10/2014 as the beginning date and 1/10/2015 as the expected end date. *Id.*

On or around July 17, 2014, Kathleen McClellan, Chief of Employment Section 5 at the IRS, emailed Ms. Mahoney, the Hardship Relocation Coordinator ("HRC"), and informed Ms. Mahoney that Ms. McClellan had received an expedited ERC ticket that evening from Plaintiff and had spoken with Plaintiff. ECF No. 47-13, at 8. Ms. McClellan's email to Ms. Mahoney stated that: "I spoke with her and she is interested in applying for a Hardship Transfer to the DC area. I need you to forward all of the necessary paperwork to her immediately to the following email address: [email address redacted by the Court for privacy reasons]. Please include any

information you can regarding the program and the requirements, time table, etc.  I need you to take care of this first thing when you get in tomorrow.  Please cc me on your email to her." *Id.* (emphasis in original).  Ms. McClellan's email was marked as high importance. *Id.*

The next morning at 7:41 a.m., while Plaintiff was still hospitalized at WPIC, Ms. Mahoney emailed Plaintiff and attached a Hardship Relocation application and instructions and information and invited Plaintiff to contact her with questions.  ECF No. 58, at ¶ 22;  ECF No. 47-13, at 9. Under the box labeled "Description of Hardship," the blank Hardship Relocation application instructed the applicant to "[p]lease attach documentation justifying request (e.g., medical doctor's letter, etc.)."  ECF No. 58, at ¶ 23.  Ms. Mahoney's July 18, 2014 email also attached Hardship Relocation application instructions that directed the applicant to "[i]nclude any documentation to substantiate your hardship" and cited "doctor's statements" as an example of such support.  ECF No. 58, at ¶ 24.  The instructions attached to Ms. Mahoney's July 18, 2014 email also noted, in all bold lettering, "[t]here is no definite timeframe for placement.  Acceptance to the Hardship Program does not guarantee placement." *Id.*

Plaintiff's sister, Vendetta Terry, submitted Plaintiff's Hardship Relocation Application to Plaintiff's supervisor Ms. Garrison (rather than to Hardship Relocation Coordinator Mahoney) the same day via email from Plaintiff's G-mail account;  the "Description of hardship" was listed as "SEE FMLA." *Id.* at ¶¶ 26, 27.  Under "IRS Post(s) of Duty requested and justification for each post-of-duty specified" Plaintiff or her sister wrote "WASHINGTON, DC OR ATL, GA FAMILY SUPPORT[.]" *Id.* at ¶ 27.  Plaintiff did not attach any accompanying paperwork to her application, such as documentation by her physician or other health care professionals.  ECF No. 58, at ¶ 28. Ms. Garrison reviewed Plaintiff's July 18, 2014 Hardship Relocation request when she received it.  ECF No. 53, at ¶ 11.  Upon receiving Plaintiff's Hardship Relocation request, Ms. Garrison

also forwarded it up the chain to Ben Kopriva and Rosemary Miller (Plaintiff's second-and third-level supervisors, respectively), but not to Hardship Relocation Coordinator Mahoney. ECF No. 58, at ¶ 30.

On August 6, 2014, Plaintiff's FMLA request was approved and she took the maximum 12 weeks of FMLA leave between July 2014 and October 2014. *Id*. at ¶ 70. The letter approving Plaintiff's FMLA request stated: "Nickole Nesby suffers from medical conditions that would be considered as 'serious' under the FMLA. She required continuous leave starting July 14, 2014 through July 18, 2014 . . . Additional leave will likely be needed . . . ." ECF No. 53, at ¶ 24; ECF No. 51-17, at 36. In addition to the 12 weeks of FMLA leave, the IRS granted Plaintiff six weeks (or 240 hours) of paid, advance sick leave, which she recalled receiving between September 2014 and December 2014. ECF No. 58, at ¶ 71.

Plaintiff's second-level supervisor Mr. Kopriva followed up with third-level supervisor Ms. Miller regarding Plaintiff's original Hardship Relocation request in September 2014, and Ms. Miller's response to the inquiry was: "Oh, shit." ECF No. 58, at ¶ 77; ECF No. 50, at ¶ 30; ECF No. 53, at ¶ 30. Ms. Miller also told Mr. Kopriva that she would contact the HRC. ECF No. 50, at ¶ 31; ECF No. 53, at ¶ 31. At some point after this September 2014 interaction between Ms. Miller and Mr. Kopriva, Ms. Miller told Mr. Kopriva that Plaintiff's Hardship Relocation request was incomplete, but did not direct Mr. Kopriva to do anything regarding Plaintiff's request. ECF No. 50, at ¶¶ 32–33; ECF No. 53, at ¶¶ 32–33. Mr. Kopriva testified that he does not believe that Ms. Miller ever asked him to contact Plaintiff to let her know the documents were incomplete. ECF No. 53, at ¶ 35. In September 2014, Mr. Kopriva informed Plaintiff's first-level supervisor, Ms. Garrison, that Plaintiff's Hardship Relocation request was incomplete. ECF No. 50, at ¶ 36; ECF. No. 53, at ¶ 36.

On September 24, 2014, Plaintiff returned to work for a single day, but left early;  in her own words, she was "entirely too upset to complete the day."  ECF No. 51-17, at 6;  ECF No. 50, at ¶ 38;  ECF No. 53, at ¶ 38.  The record does not reflect why Plaintiff was too upset to complete the day.  At that time, Ms. Garrison informed Plaintiff that her Hardship Relocation request was not processed because it was incomplete.  ECF No. 50, at ¶ 38;  ECF No. 53, at ¶ 38.  That was the first time anyone informed Plaintiff that the Hardship Relocation request had not been processed.  ECF No. 50, at ¶ 38;  ECF No. 53, at ¶ 38.

On September 25, 2014, Plaintiff emailed Hardship Relocation Coordinator Ms. Mahoney, and told her that Plaintiff had just become aware that her Hardship Relocation request was "not submitted" and that the "form needed additional information for submission."  ECF No. 58, at ¶ 39.  Plaintiff attached a series of documents, but not her original Hardship Relocation request or any revised application, and not any medical documentation explaining or justifying a request for Hardship Relocation.  ECF No. 58, at ¶ 39.  Either that day or the following day, Plaintiff sent Ms. Garrison and the union steward an email that attached a second Hardship Relocation request.  ECF No. 58, at ¶ 41.  In the body of her email, Plaintiff wrote that "due to the hostile work environment and continued harassment at the Pittsburgh call site, I am submitting my second request to relocate under the hardship relocation program."  ECF No. 58, at ¶ 41.

On September 29, 2014, Plaintiff submitted a second Hardship Relocation request to Ms. Garrison via email.  ECF No. 50, at ¶ 41;  ECF No. 53, at ¶ 41.  In the second Hardship Relocation request, Plaintiff wrote the following in the field asking her to describe her hardship:

> Currently, I suffer from depression due to the hostile work environment at the Pittsburgh, PA call site.  I am requesting to relocate and continue my employment in a harassment free environment where I can thrive and excel.  My family will provide a much needed supported (sic) system.

ECF No. 58, at ¶ 42;  ECF No. 53, at ¶ 41.  In the second Hardship Relocation request, Plaintiff only identified the "District of Columbia, Maryland or Virginia (DMV Area)" as her desired post of duty and provided the following "justification" for seeking that post:  "I have family located in Washington, D.C., which will serve as a support system for me."  ECF No. 58, at ¶ 43;  ECF No. 53, at ¶ 41.  Plaintiff did not include, reference, or attach any supporting medical documentation as part of the second request.  ECF No. 58, at ¶ 44.  Plaintiff's second Hardship Relocation request was forwarded to Mr. Kopriva and Ms. Miller.  ECF No. 58, at ¶ 45.  Although Plaintiff's second request was not sent to Ms. Mahoney, the HRC, Ms. Mahoney later testified that it was incomplete because it lacked:  (a) Plaintiff's supervisor's signatures;  and (b) any supporting documentation. ECF No. 58, at ¶¶ 45–46;  *see also*, ECF No. 53, at ¶¶ 42–43.

On October 2, 2014, Ms. Mahoney replied to Plaintiff's September 25, 2014 email and informed Plaintiff that she "received [her] attachments, but . . . didn't receive [Plaintiff's] application for hardship," and then asked Plaintiff to provide her "manager's name so [the HRC] can get into contact with here (sic)."  ECF No. 58, at ¶ 47;  *see also*, ECF No. 53, at ¶ 47.  Plaintiff replied to that October 2, 2014 email later the same day, and provided HRC Mahoney with the name of her first-line supervisor, Ms. Garrison, but did not attach either the original Hardship Relocation request or the second Hardship Relocation request to her email.  ECF No. 58, at ¶ 48; ECF No. 53, at ¶ 47.  On October 10, 2014, Plaintiff sent the HRC an email with an attachment that purported to be Plaintiff's third Hardship Relocation request, but the attachment was unreadable.  ECF No. 58, at ¶ 49;  ECF No. 53, at ¶ 51.

On or about October 11, 2014, Plaintiff presented to her therapist, Carole D. Nelson, as "extremely upset," "extremely unhappy" and "completely overwhelmed";  told Ms. Nelson that she "could not see any future";  and Ms. Nelson's notes from that October 11, 2014 session state

that Plaintiff "appear[ed] to know that she need[ed] to go to the hospital" and that an "inpatient stay [would] be in [Plaintiff's] best interest.  ECF No. 58, at ¶ 56;  *see also*, ECF No. 47-25, at 3. Shortly thereafter, Plaintiff attempted suicide, was taken to UPMC-McKeesport, and then transferred and admitted to Clarion Hospital, where she spent nine days receiving psychiatric treatment.  ECF No. 58, at ¶ 57.  After her discharge from Clarion Hospital, Plaintiff told her therapist that she was "thinking of going back to the hospital," remained "extremely unhappy," and still did not "see any future."  *Id*. at ¶ 58.

Plaintiff submitted a letter dated October 22, 2014 to her IRS supervisors from Kelsey Ott-Sudik, a licensed social worker, who stated that Plaintiff had recently been hospitalized with a "depressed mood," and "recommended that [Plaintiff] be considered for a transfer to continue her employment in a health (sic) and decreased stressful environment due to her disability and recent diagnosis."  ECF No. 58, at ¶ 59.  Mr. Kopriva spoke to Ms. Miller about the October 22, 2014 Ott-Sudik letter.  ECF No. 53, at ¶ 55.  Ms. Miller decided that the document was not appropriate medical documentation because it was signed by a social worker and not a "health care provider." ECF No. 53, at ¶ 55.

On October 28, 2014, Ms. Miller sent Plaintiff an email that stated:

> Your paperwork was received in the front office today at 12:48 pm. However, the paperwork is a notice from Universal Health Services Inc.  The notice is not from a health care provider it is from a social worker.  I am sorry to inform you that this documentation is not sufficient and we will need something from your health care provider.

ECF No. 53, at ¶ 56.

On October 30, 2014, Plaintiff informed both Ms. Miller and Ms. Garrison that Ms. Ott-Sudik was a licensed social worker at Clarion Psychiatric Clinic.  ECF No. 53, at ¶ 59.  Ms. Garrison sent Plaintiff an email dated October 31, 2014 that referenced Plaintiff's October 2014

hospitalization, and informed Plaintiff that her FMLA leave expired and she was being charged with absence without leave ("AWOL") as of October 27, 2014.  ECF No. 53, at ¶ 60.

On November 4, 2014, Dr. Santiago Almanzar wrote a letter "To whom it may concern," in which he confirmed that he had diagnosed Plaintiff with "[a]djustment disorder with depressed mood" during her October 2014 hospitalization, and recommended that she "be in a stable and supportive environment to help decrease her symptoms."  ECF No. 58, at ¶ 60;  ECF No. 53, at ¶ 61.  Dr. Almanzar's letter stated "[a]ny question or concerns, please contact Kelsey Ott-Sudik, Licensed Social Worker."  ECF No. 53, at ¶ 61.  Ms. Miller did not attempt to contact either Ms. Ott-Sudik or Dr. Almanzar and she did not direct anyone else to do so.  ECF No. 53, at ¶ 62.

On November 7, 2014, HRC Ms. Mahoney sent the following email to Plaintiff:

> Did you get a chance to redo your hardship application???
> Remember I sent it back to you and told you I couldn't print it out,
> I'll send you another one fill it out and email it back to me.  I'll get
> the signatures.  And also I'll need documentation that would support
> your request for Hardship.   Email the complete form and
> documentation directly back to me.  I'm working from home I'll be
> back in the office next week.

ECF No. 53, at ¶ 63.

On November 12, 2014, Plaintiff's treating psychiatrist, Dr. Slayton, wrote that Plaintiff "remains incapacitated by her psychiatric symptoms . . . has been incapacitated 7/10/2014 to present . . . is unable to work at this time" and "there is no distinct determination as to when [she] can return to work."  ECF No. 58, at ¶ 62;  ECF No. 47-34, at 7.

On November 13, 2014, Ms. Garrison sent Plaintiff a letter regarding Plaintiff's "[a]bsence from work," in which she noted that—aside from September 24, 2014—Plaintiff had not reported to work since July 10, 2014.  ECF No. 58, at ¶ 63;  ECF No. 47-26, at 2.  Ms. Garrison noted that Plaintiff's FMLA leave expired on October 3, 2014, and stated:  "If you have a disability and

request a reasonable accommodation, you should contact the Reasonable Accommodation
Coordinator (RAC)." *Id.* Ms. Garrison also reminded Plaintiff of her right to request unpaid leave
under FMLA, and the availability of the Employee Assistance Program. *Id*.

At 9:11 a.m. on November 24, 2012, Plaintiff sent Ms. Garrison and Mr. Kopriva the
following email:

> This is a follow-up to last week.  After receiving the certified letter,
> I contacted you via email and left three voicemail messages to
> discuss the letter.  As of today, November 24, 2014, you have not
> responded.
>
> I am requesting to speak with you.  After three attempts to contact
> RAC, Thursday, Iris Presley returned my call.   During the
> conversation, she suggested I contact my manager for her response.
>
> My telephone number is 412-310-6077.  I will be changing my
> address to 513 Cochran Street, Duquesne, Pennsylvania, 15110.
>
> Thank you,
> Nickole Nesby

ECF No. 51-6.

Twenty-six minutes later, at 9:27 a.m. on November 24, 2014, Ms. Garrison responded to
Plaintiff's email:  "Nickole, I just left you a message advising you that your information was
received and being reviewed.  I will update my records with your mailing address."  ECF No. 50,
ECF No. 53, at ¶ 66;  ECF No. 51-6.  Plaintiff responded less than an hour later, stating that an
employee assistance program representative had suggested that she speak with Ms. Garrison
regarding her "employment status/returning to work options[.]"  ECF No. 50, at ¶ 66;  ECF No.
53, at ¶ 66;  ECF No. 51-6.  Plaintiff requested a meeting with Ms. Garrison and requested a
timeframe for the agency's review process.  ECF No. 53, at ¶ 66.  On or about November 26, 2014,
Plaintiff and Ms. Garrison discussed a possible leave of absence from work.  ECF No. 53, at ¶ 68.

On December 3, 2014, Plaintiff saw her psychiatrist, and then informed her supervisors at the IRS that the psychiatrist had "not determined a return to work date" yet, and that her next scheduled appointment with him was not until December 28, 2014.  ECF No. 58, at ¶ 65.  On January 12, or January 17, 2015 (the parties are uncertain as to the exact date), Plaintiff's treating psychiatrist wrote that Plaintiff "is under the care of a psychiatrist [and] therapist" and "remains incapacitated and unable to work at this time." *Id.* at ¶ 66.

On December 10, 2014, Mr. Kopriva forwarded an email he had received from Plaintiff to Ms. Miller and informed Ms. Miller that Plaintiff had "asked [him] if we had seen her hardship transfer request" and stated that Mr. Kopriva would "be more than happy to call her back and advise the transfer request does not have supporting documentation."  ECF No. 53, at ¶ 53;  ECF No. 51-17, at 49.

On December 19, 2014, in response to an email from Plaintiff asking why her request for leave without pay was denied, Mr. Kopriva informed Plaintiff that Defendant had "never received an official request for leave of absence which would put you in a Leave Without Pay status (LWOP)[.]" ECF No. 53, at ¶ 71.

On April 22, 2015, a human resource specialist wrote in an email to Ms. Miller and Ms. Miller's immediate supervisor, Nancy Aiello:  "Nothing is going to change the fact that [Plaintiff] cannot come back to work, unless you want to reassign her."  ECF No. 53, at ¶ 72.

In April 2015, Plaintiff was again admitted to WPIC with "worsening depression, anxiety, and [suicidal ideation.]"  ECF No. 58, at ¶ 67.

Plaintiff never claimed to the IRS that her depression and/or mental illness were "not treatable" in the Pittsburgh area. ECF No. 58, at ¶ 54.  After September 2014, Plaintiff never

provided anyone at the IRS a proposed return-to-work date, and none of her treating physicians or therapists ever established such a date.  ECF No. 58, at ¶ 73.

There were open and available Contact Representative positions in or around the Atlanta, Georgia area between August 2014 and April 2015.  ECF No. 53, at ¶ 73.

The IRS terminated Plaintiff's employment in early June 2015.  ECF No. 58, at ¶ 79;  ECF ECF No. 53, at ¶ 73.

## II.   Legal Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Razak v. Uber Techs., Inc.,* 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *NAACP v. N. Hudson Reg'l Fire & Rescue,* 666 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc*., 814 F.2d 893, 896 (3d Cir. 1987)).  That said, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87. Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e)…requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor…to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence;  there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).

Where, as here, "cross-motions for summary judgment are filed, 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Reynolds v. Chesapeake & Del. Brewing Holdings, LLC*, Civil Action No. 19-2184, 2020 U.S. Dist. LEXIS 83633, at *6 (E.D. Pa. May 12, 2020) (quoting *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)).

**III.     Discussion**

For the reasons that follow, Defendant is entitled to summary judgment on Plaintiff's first claim of disability discrimination under the Rehabilitation Act.  Given the undisputed facts, a reasonable jury could not find that Plaintiff was qualified under the Rehabilitation Act because there is no genuine question that she could not perform the essential functions of her position, even with reasonable accommodation.  Therefore, she is not a qualified individual who is subject to the protections of the Rehab Act as a matter of law.

However, summary judgment is not appropriate as to Plaintiff's second claim, that the IRS retaliated against her for engaging in protected activities by denying or delaying processing her Hardship Relocation requests and request for leave of absence.  Viewing the facts in the light most favorable to Plaintiff, genuine issues of fact remain for trial.

## A.  Defendant is Entitled to Summary Judgment on Plaintiff's Rehabilitation Act Claim because Plaintiff is Not a "Qualified Individual."

### 1.  Legal Standard for Disability Discrimination Claims Under the Rehabilitation Act

Under the Rehabilitation Act, as a federal agency, the IRS cannot discriminate against an individual in employment solely on the basis of disability if that individual is otherwise qualified. 29 U.S.C. § 794(a), (b)(1)(a).  Courts apply the standards of Title I of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 1211, *et seq.*, and sections §§ 501–504, 540 to determine if a federal agency violated § 794(a) of the Rehabilitation Act.  29 U.S.C. § 794(d).

To recover under the Rehabilitation Act a plaintiff must establish that:

> (1) she has a disability;  (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer;  and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.

*George v. Cty. of Allegheny*, Civil Action No. 11-17, 2013 U.S. Dist. LEXIS 115884, at *8 (W.D. Pa. Aug. 16, 2013).

"An employer discriminates against a qualified individual when it fails to make reasonable accommodations to the known physical or mental limitations of such individual unless the employer can demonstrate that such accommodation would impose an undue hardship on the operation of its business." *George*, 2013 U.S. Dist. LEXIS 11584, at *8–9; *see also,* 42 U.S.C. § 12112(b)(5).

**2. Plaintiff is Not a Qualified Individual under the Rehabilitation Act because She Could Not Perform the Essential Functions of Her Position, with or without Reasonable Accommodation.**

To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must demonstrate that, at the time of the applicable employment decision, here, the IRS's delay and/or denial of Plaintiff's Hardship Relocation requests, she was a "qualified individual," i.e., that she could perform all of the essential functions her position with or without reasonable accommodation. *Miller v. Coca-Cola Refreshments USA, Inc.*, No. 2:16-cv-93, 2018 WL 1456502, at *9 (W.D. Pa. Mar. 23, 2018). The undisputed facts show that Plaintiff was incapable of performing the essential functions of her job without a transfer to a new location. However, as discussed more fully below, Plaintiff's requests for a transfer and indefinite leave are not reasonable accommodations. Accordingly, Plaintiff cannot establish a prima facie case of disability discrimination under the Rehabilitation Act.

**A. Plaintiff was Unable to Perform the Essential Functions of Her Job Without Accommodations**

The undisputed facts show that Plaintiff was unable to perform the essential job functions of a CSR beginning in July 2014 and lasting through at least January 1, 2015 without

accommodations. As part of Plaintiff's July 2014 FMLA application, a request that she later referenced as the basis for her first Hardship Relocation request on July 17, 2014, *see* ECF No. 58, at ¶¶ 26, 27 and ECF No. 47-11, at 10, Plaintiff's physician reported that Plaintiff was "unable to perform any of [her] job functions due to [her] condition" and that Plaintiff would be "incapacitated for a single continuous period of time due to her medical condition." *See* ECF No. 47-11, at 4–5. When Plaintiff's physician filled out Plaintiff's FMLA application documents on July 17, 2014, he did not determine the beginning and end dates for Plaintiff's period of incapacity. *See* ECF No. 47-11, at 5.

Following her July 2014 hospitalization, Plaintiff applied for disability benefits, claiming that she was unable to work because of her depression. ECF No. 58, at ¶ 80. In connection with that application, Dr. Pratt's August 11, 2014 assessment indicated that Plaintiff's major depressive disorder, which began on July 10, 2014 and was expected to last until January 10, 2015, temporarily precluded "*any* gainful employment."[1] ECF Nos. 47-46 (emphasis added). Though the fact that an employee represented to the government that she cannot work in an application for disability benefits, for example Social Security disability insurance benefits, is not dispositive on its own, "the attainment of disability benefits is certainly some evidence of an assertion that would be inconsistent that the party is a qualified individual." *Motley v. N.J. State Police,* 196 F.3d 160, 166 (3d Cir. 1999). To survive summary judgment, a plaintiff may not simply state that the statutory scheme for disability benefits differs from the protections under the Rehabilitation Act;

---

[1] Dr. Pratt's August 2014 assessment indicated that Plaintiff's inability to work might end in January 2015; however, on November 18, 2014, after Plaintiff was re-hospitalized following a suicide attempt, Psychiatric Associates of Western Pennsylvania opined that Plaintiff was still unable to work due to her disability and could not determine when she would be able to return to work. ECF No. 47-37, at 6. On December 3, 2014, Plaintiff saw her psychiatrist, and then informed her supervisors at the IRS that the psychiatrist had "not determined a return to work date" yet, and that her next scheduled appointment with him was not until December 28, 2014. ECF No. 58, at ¶ 65. On January 12, or 17, 2015, Plaintiff's treating psychiatrist wrote that Plaintiff "is under the care of a psychiatrist [and] therapist" and "remains incapacitated and unable to work at this time." *Id.* at ¶ 66.

rather, the plaintiff must affirmatively resolve the apparent inconsistency. *Motley*, 196 F.3d at 165. The plaintiff's explanation of the inconsistent positions "must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of or [her] good faith in belief in the earlier statement, [she] could nonetheless perform the essential functions of [her] job, with or without reasonable accommodation." *Motley*, 196 F.3d at 165 (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2732.3 (West Supp. 1999)); *see DeGroat v. Power Logistics,* 118 Fed.Appx. 575, 576 (3d Cir. 2004); *Anishevich v. Blue Ridge Pressure Castings, Inc.*, No. 3:08-0966, 2009 WL 3335545, at *7–9 (M.D. Pa. Oct. 14, 2009).

Plaintiff cannot sufficiently resolve the inconsistency here. She relies on the June 26, 2017 statement of one expert psychologist, Dr. Scott L. Tracy, Ph.D., to support her claim that, back in the fall of 2014, she could have worked if she was transferred to a different location with the IRS or given a leave of absence as a reasonable accommodation.[2] *See* ECF No. 51-10, at 5; ECF No. 57, at 6–7. Plaintiff's counsel referred Plaintiff to Dr. Tracy and Dr. Tracy testified that Plaintiff has never been his patient. ECF No. 51-10, at 2; ECF No. 47-41, at 21:7–14. Dr. Tracy's June 26, 2017 statement was taken after a 90-minute interview with Plaintiff that occurred almost three years after her July 2014 transfer request. ECF No. 51-10, at 2. Taking the facts in the light most favorable to Plaintiff, her subjective belief that she could have worked if she was transferred to

---

[2] Plaintiff also claims that she requested a medical leave of absence as a reasonable accommodation in November 2014. *See* ECF No. 49, at 9; ECF No. 51-7. However, Plaintiff's July 2014 FMLA request was approved and she took the maximum 12 weeks of FMLA leave between July 2014 and October 2014. ECF No. 50, at ¶ 70. In addition to the 12 weeks of FMLA leave, the IRS granted Plaintiff an additional six weeks of *paid*, advance sick leave. ECF No. 50, at ¶ 71. In January 2015, Plaintiff told her psychiatrist that the IRS offered her "a [year's] L.O.A. [Leave of Absence] or early retirement." ECF No. 50, at ¶ 72. Plaintiff claims to have requested a medical leave of absence on or around November 26, 2014. *See* ECF No. 51-7 On December 3, 2014, Plaintiff's psychiatrist could not determine when she would be able to return to work. ECF No. 58, at ¶ 65. An indefinite leave of absence is not a reasonable accommodation in the Third Circuit. *See e.g., Tolliver v. Trinity Parish Found.*, 723 Fed. Appx. 166, 171 (3d Cir. 2018); *Fogleman v. Greater Hazelton Health Alliance*, 122 Fed.Appx. 581, 585–86 (3d Cir. 2004) ("There is no evidence that permits any conclusion other than that the requested leave was for an indefinite and open-ended period of time. This does not constitute a reasonable accommodation.").

another post or if she received another medical leave of absence after her FMLA and the advanced sick days the IRS provided her, together with Dr. Tracy's statements from almost three years after Plaintiff's July 2014 hospitalization and request for transfer, cannot create a genuine question of fact for trial.

To the contrary, the medical evidence contemporaneous to Plaintiff's 2014 diagnoses of major depressive disorder and hospitalizations, viewed in the light most favorable to Plaintiff, demonstrates that she was not able to perform the essential functions of her position at IRS absent reasonable accommodation.  Plaintiff's own treating physician, Dr. Slayton, opined as late as November 12, 2014, that Plaintiff "remain[ed] incapacitated by her psychiatric symptoms. . . has been incapacitated 7/10/2014 to present . . . is unable to work at this time . . . [and] there is no distinct determination as to when [she] can return to work."  ECF No. 58, at ¶ 62;  ECF No. 47-37, at 7–8.  In January 2015, Plaintiff's treating psychiatrist wrote that Plaintiff "is under the care of a psychiatrist [and] therapist" and she "remains incapacitated and unable to work at this time." *Id*. at ¶ 66.

Additionally, as the court in *Motley* explained, the statutory schemes differ regarding claims of disability for the purposes of disability insurance benefits and claims of disability for the purposes of the Americans with Disabilities Act, or, here, the Rehabilitation Act.  *See Motley*, 196 F.3d at 164.  For instance, the Rehabilitation Act analysis considers whether the person with a disability can perform the job's functions even with a reasonable accommodation, whereas the former does not.  *Id*.  Therefore, a plaintiff could reconcile statements in an application for disability benefits with a claim under the Rehabilitation Act by demonstrating that she could still perform the job functions with a reasonable accommodation.  *Id*.  However, for the reasons stated more fully below, Plaintiff has not done so here.

19

### B. Plaintiff Cannot Show that She was Able to Perform her Essential Job Functions Even with Reasonable Accommodations

Plaintiff claims that she is a "qualified person" under the Rehabilitation Act because she could have performed the essential functions of her job as a CSR despite her disability if she was given a reasonable accommodation in the form of either an indefinite leave of absence or a transfer to another IRS location closer to family and a supportive environment, specifically, Washington, D.C. or Atlanta, Georgia. ECF No. 49, at 5–6. Plaintiff supports her position by pointing to a letter from her social worker, Kelsey Ott-Sudik, that "recommended that [Plaintiff] be considered for a transfer to continue her employment in a health (sic) and decreased stressful environment due to her disability and recent diagnosis." ECF No. 57, at 7; ECF No. 47-34, at Ex. HH. Plaintiff also notes that her psychiatrist, Dr. Almanzar, recommended that she "be in a stable and supportive environment to help decrease her symptoms[,]" ECF No. 47-35, and another psychiatrist, Dr. Slayton, recommended that she "be transferred to a less stressful position within the I.R.S." ECF No. 57, at 7; ECF No. 47-11, at 8.

In essence, Plaintiff is contending that she could perform the essential functions of her job as a CSR if she was transferred to a less stressful position in a more supportive environment. But a request to be transferred to a less stressful position, or to a more stable and supporting environment, is unreasonable as a matter of law. Though Equal Employment Opportunity Commission regulations provide for reassignment to a vacant position as a form of accommodation, 29 C.F.R. § 1630.2(o)(ii), "[r]eassignment is an accommodation of last resort." *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.2d 1011, 1019 (8th Cir. 2000), *accord. Moore v. CVS Rx. Servs.*, 142 Fed.Supp.3d 321, 336 (M.D. Pa. 2015). "In their quest for adequate [disability] accommodation, employees should not forget that the purpose of such accommodation

20

is to permit them to continue working in their prior roles with certain adaptations." *Moore*, 142 Fed.Supp.3d at 341.

As in *Gaul v. Lucent Techs.*, 134 F.3d 576 (3d Cir. 1998), Plaintiff's request in this case could never be achieved beyond temporary compliance because it depends on Plaintiff's stress level at any given moment and the stability and supporting nature, or lack thereof, of her environment, including her familial supports. *Id.* Plaintiff's request would also impose "extraordinary administrative burdens" on IRS to constantly monitor her environment, including her family circumstances, to ensure that it is stable and supportive, and this would require far too much oversight of variables that are not in the IRS's control. *Id; see also*, *Cobb v. Phila. Gas Works,* Civil Action No. 01-4937, 2004 U.S. Dist. LEXIS 6685, at *30–31 (E.D. Pa. Mar. 31, 2004). To determine whether Plaintiff's requested transfers to Washington, D.C. or Atlanta, Georgia would be supportive environments or less stressful for Plaintiff would necessarily require the IRS to assess Plaintiff's many familial relationships and support systems in Pittsburgh and compare them with those in Washington, D.C. and Atlanta. Such a task imposes an undue burden on the IRS financially as well as practically and would risk infringing on Plaintiff's family's privacy because it would require subjecting Plaintiff's family and community to continuous surveillance to ensure that Plaintiff is located in a supportive and stable environment. Accordingly, Plaintiff's requests to be transferred are unreasonable as a matter of law.

Plaintiff also claims that the IRS discriminated against her by not accommodating her depression by giving her medical leave of absence. *See* ECF No. 49, at 8–9. However, Plaintiff's request for an indefinite leave of absence is also unreasonable as a matter of law. Courts within this Circuit have consistently held that that an indefinite leave of absence is not a reasonable accommodation. *See e.g.*, *Moore v. CVS Rx. Servs.*, 142 F.Supp.3d 321, 338 (M.D. Pa. Oct. 30,

2015); *see also*, *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.2d 661, 664, 671 (3d Cir. 1999) (holding that providing indefinite leave as an accommodation to an employee's depression places an undue burden on the employer).  Plaintiff applied for and received 12 weeks of FMLA leave. ECF No. 58, at ¶ 70.  In addition, the IRS granted Plaintiff six weeks of paid advance sick leave, which Plaintiff used between September 2014 and December 2014.  *Id.* at ¶ 71.  On December 19, 2014, in response to Plaintiff's December 17, 2014 email asking why her requests for leave without pay were denied, Mr. Kopriva stated that Defendant "never received an official request from you for a leave of absence which would put you in a Leave Without Pay status."  ECF No. 53, at ¶ 71; ECF No. 51-29.  However, on December 3, 2014, Plaintiff's psychiatrist had "not determined a return to work date" yet.  ECF No. 58, at ¶ 65. On December 10, 2014, Plaintiff emailed Mr. Kopriva and Ms. Garrison and stated that "[p]er our conversation today, my doctor has not determined a returned to work date on December 3, 2014.  My next scheduled appointment is December 28th.  Therefore, I will be unable to determine acceptance of Leave of Absence without consulting him."  ECF No. 51-17, at 49.  Therefore, Plaintiff's request for indefinite leave is not a reasonable accommodation.  *See Moore*, 142 F.Supp.3d at 338.

Plaintiff also argues that she is entitled to judgment in her favor because the IRS failed to participate in the interactive process in her requests for an indefinite leave of absence or a transfer as an accommodation of her disability.  However, a plaintiff cannot maintain a failure to accommodate claim based on lack of engagement in the interactive process where, as here, the employee's only proposed accommodations are unreasonable as a matter of law.  *Ozlek v. Potter*, 259 Fed.Appx. 417, 421 (3d Cir. 2007) (non-precedential); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 316 n.7 (3d Cir. 1999);  *Gaul*, 134 F.3d at 581 ("[H]is proposed accommodation was unreasonable as a matter of law.  Therefore, Gaul is not a 'qualified individual' under the ADA,

and [his employer's] alleged failure to investigate into reasonable accommodation is unimportant . . . [and] the district court properly granted summary judgment as to Gaul's ADA claim.").

Because Plaintiff's requested accommodations are unreasonable as a matter of law, she cannot establish that she is a "qualified individual" subject to the protections of the Rehabilitation Act.   Therefore, Defendant's Motion for Summary Judgment on Plaintiff's disability discrimination claim is granted, and Plaintiff's Motion is denied.

## B.  Plaintiff's Retaliation Claim Presents a Triable Question of Material Fact

In addition to her disability discrimination claim, Plaintiff contends that the IRS retaliated against her for "engag[ing] in protected conduct as protected by Title VII of the Civil Rights Act of 1964" by delaying and/or denying Plaintiff's requests for reasonable accommodation of her major depressive disorder, which in turn led to her termination.  ECF No. 1, at ¶ 59.  Neither the Complaint nor Plaintiff's response to Defendant's Motion for Summary Judgment specify whether Plaintiff's "protected conduct" relates to her efforts to report alleged race discrimination, circumstances she addressed in her withdrawn administrative charges of racial discrimination, or her absence and requests related to her major depressive disorder, or both.  *See generally*, ECF No. 1. and ECF No. 57.  Defendant seeks summary judgment as to Plaintiff's claim for retaliation, arguing that Defendant had legitimate non-discriminatory reasons to deny Plaintiff's Hardship Relocation requests and that Plaintiff cannot prove those reasons are pretextual.  *See* ECF No. 44; ECF No. 45, at 15–19.  Viewing the facts in the light most favorable to the Plaintiff, the Court will construe Plaintiff's retaliation claim broadly, to include allegations of retaliation based on Plaintiff's previous charges of racial discrimination, as well as her current charges of disability discrimination and the leave she took to address her major depressive disorder.  Because genuine issues of fact exist regarding pretext, Plaintiff's claim survives to trial.

### 1.  Legal Standard for Retaliation Claims

Courts apply the *McDonnell Douglas* burden-shifting framework to Title VII retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that established framework, a plaintiff "must first establish a prima facie case by showing (1) she engaged in protected activity;  (2) suffered adverse action by the employer;  and (3) there is a causal connection between the employer's activity and the employer's adverse action." *Gress v. Temple Univ. Health Sys.*, 784 Fed.Appx. 100, 105 (3d Cir. 2019); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  Once a plaintiff makes out a prima facie case of retaliation, the burden of production shifts and the employer must provide "a legitimate, non-retaliatory reason" for the adverse employment action. *Gress*, 784 Fed.Appx. at 105; *Woodson*, 109 F.3d 913, 920 n.2 (3d Cir. 1997).  The employer's burden is "relatively light" and "is satisfied if the defendant articulates any legitimate reason for the adverse employment action." *Krouse*, 126 F.3d at 501 (cleaned up). "[T]he defendant need not prove that the articulated reason actually motivated the action." *Id.* (cleaned up).  If the employer succeeds, the burden shifts back to the plaintiff to convince the factfinder that "the employer's proffered explanation was false, *and* that retaliation was the real reason for the adverse employment action," i.e, that the employer's proffered explanation was pretext for discrimination. *Id.*  "It is not enough . . . to disbelieve the employer;  the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993).  It is the plaintiff's burden to show the employer's retaliatory animus, that such animus played a role in the decision-making process, and that such animus was outcome-determinative. *Krouse*, 126 F.3d at 501.

**2.   Reasonable Minds Could Differ as to the Merits of Plaintiff's Retaliation Claim**

Plaintiff alleges that the IRS delayed processing and denied her Hardship Relocation requests in retaliation for Plaintiff conducting activities that are protected under Title VII. Summary judgment is not appropriate as to Plaintiff's retaliation claim because, looking at the facts in the light most favorable to Plaintiff, reasonable minds could differ as to whether the IRS delayed and/or denied Plaintiff's Hardship Relocation requests as pretext for discriminatory animus against Plaintiff based on her complaint of racial discrimination or her disability-related requests.

For the purposes of its Motion for Summary Judgment, Defendant assumed that Plaintiff could establish a prima facie case of retaliation.  ECF No. 46, at 16.  The Court will do the same. Defendant contends, however, that it had a "series of legitimate, non-discriminatory reasons not to approve Plaintiff's Hardship Relocation application[.]"  *Id*.  The IRS notes that the Hardship Relocation program is created and governed by the Collective Bargaining Agreement the IRS entered into with its employees' union.  *See* ECF No. 46, at 15 n.12.  The IRS also argues that Plaintiff never submitted a Hardship Relocation request that complied with the requirements of a completed request under the IRS's Collective Bargaining Agreement.  *See* ECF No. 46, at 16.  The IRS contends that Plaintiff's initial application was insufficient because it said only "See FMLA" in the section asking her to describe her hardship and that she did not attach any form of medical support.  *Id.* at 17.  It claims that the second application was insufficient because Plaintiff did not attach a doctor/therapist's note or other document supporting the request.  *Id.*  The IRS claims that the third request was unreadable and that Plaintiff's applications "failed to include 'verifiable documentation concerning the situation or condition that gave rise to [her] request.'"  *Id*.  The IRS notes that "Plaintiff's supervisors and the HRC clearly had discretion to reject the applications as

incomplete, and to not further process them if (as in the case of each of Plaintiff's applications) they were missing necessary material." ECF No. 46, at 17. The IRS has satisfied its "relatively light" burden of articulating a legitimate, non-discriminatory reason for its action(s).

According to Plaintiff, however, the IRS's reasons for delaying and denying her Hardship Relocation requests are pretextual. ECF No. 57, at 19–20. Plaintiffs can establish that a defendant's legitimate reasons for an employment action are pretextual in two ways: (1) by demonstrating evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by defendant so that a factfinder could reasonably conclude that each reason was a fabrication"; or (2) the plaintiff can demonstrate evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)).

Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court finds that genuine issues of material fact exist for trial regarding whether discriminatory animus was the real reason for the IRS delaying and denying Plaintiff's Hardship Relocation requests.

The parties dispute whether Plaintiff's supervisors, including Ms. Miller, Plaintiff's third-level supervisor, knew about Plaintiff's June 30, 2014 or July 2, 2014 EEO contact when they received Plaintiff's first Hardship Relocation application. ECF No. 58, at ¶ 78. Defendant claims that "there is no evidence that any of Plaintiff's supervisors knew about Plaintiff's June 30, 2014 or July 2, 2014 EEO contact at the time they received Plaintiff's original [Hardship Relocation request]." ECF No. 58, at ¶ 78. However, Plaintiff points to the fact that the EEOC contacted Ms.

Miller in connection with Plaintiff's charge of discrimination as of April 3, 2014 as evidence that Ms. Miller was aware of Plaintiff's discrimination claims.  ECF No. 47-44, at 4.

Mr. Kopriva, Plaintiff's second-level supervisor, testified that when he followed-up with Ms. Miller regarding Plaintiff's first Hardship Relocation application in September 2014, Ms. Miller responded "Oh, shit."  ECF No. 58, at ¶ 77.  Ms. Miller then rejected Ms. Ott-Sudik's October 22, 2014 letter in support of Plaintiff's Hardship Relocation request, ECF No. 47-34, because she decided that the letter was not appropriate medical documentation because it was signed by a social worker and not a "health care provider."  ECF No. 53, at ¶ 55.

In late-September, 2014, when Plaintiff submitted her second Hardship Relocation request, the IRS was certainly on notice that she was complaining of discrimination.  Her second Relocation request included a cover letter that stated: "[d]ue to the hostile work environment and continued harassment at the Pittsburgh call site, I am submitting my second request to relocate under the hardship relocation program[,]  *Id.* at ¶ 41, and referenced "hostile work environment" as the reason for the relocation request in the body of her second application. *Id.* at ¶ 42.  After Plaintiff's third Hardship Relocation application was determined to be unreadable, Ms. Mahoney, the HRC, sent Plaintiff an email on November 7, 2014, but the contents of that email are disputed.  There are questions of fact regarding whether Ms. Mahoney promised to send Plaintiff another Hardship Relocation application and whether she ever did send Plaintiff another application to fill out. *Id.* at ¶ 51.

While the IRS offered reasons for denying or not processing each of Plaintiff's Hardship Relocation requests, Plaintiff's application process was mired in delay.  Whether that delay stemmed from non-discriminatory bureaucratic red-tape or was motivated by retaliatory animus remains a question for trial.

IV.     **Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgement, ECF No. 44, is granted in part and denied in part.  Defendant's Motion is granted with respect to Plaintiff's disability discrimination claim and denied with respect to Plaintiff's retaliation claim. Furthermore, for these same reasons, Plaintiff's Partial Motion for Summary Judgment, ECF No. 48, which seeks summary judgment in favor of Plaintiff on Plaintiff's disability discrimination claim, is denied.

An appropriate Order of Court will follow.

DATED this 9th day of April, 2021.


BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge




cc (via ECF email notification):

All Counsel of Record